Good morning. May it please the court, I'm Michael Lynch, Assistant Attorney General, appearing this morning on behalf of the individual defendants' appellants in this case. This case comes before the court on an interlocutory appeal of the issues of absolute and qualified immunity. The only claim before this court are the substantive due process claims. The plaintiffs had a lot of information. They gave it to the court. They recommended against placement of all three of the plaintiffs with Mr. Fabregas. The court disagreed, and the court directed their placement with Mr. Fabregas. And now they are subjected to civil rights litigation and claims of deliberate indifference. Were those placements subject to completion of investigations by the department? Fitness investigations? Not fitness investigations. Suitability, or whatever word you want to... Licensure. Licensure, Your Honor, is what the court directed Mr. Fabregas to pursue. The court then, because Mr. Fabregas had a criminal history that was known to the court, Mr. Fabregas requested the court to issue him a certificate of rehabilitation in order to facilitate his licensure. The court did that. And with the court certificate... Did the department object to that? No. They processed the application. And interestingly, none of the individual defendants in this case approved the license. They simply processed his application and his request for an exception based on his criminal history along with a certificate of rehabilitation. When you say they didn't approve the license, you mean they didn't sign it? None of the individual defendants in this case did, no, Your Honor. Do you agree, you know, what's hard about this case is, it would be, I think it would be a relatively easy case, for me anyway, if there were reports of some kind of abuse and then something horrible, and there was no investigation. Alright, here there's a lot of investigations, and it would, it seems to me at the end of the day, these children, or young women, as they, from children through the process, should not have been with this individual. But the department was required to resolve credibility issues throughout in deciding who to believe or, you know, whether, but there were a lot of complaints. And so then it becomes, if at some point, let's just say there had been one. They go out, they investigate it, they say it's inconclusive. I think that would be fairly easy. It would be fairly easy if they did nothing to say, hey, you're liable. You know, a kid gets killed, you hear that there's abuse, you don't do anything, you sit on your hands, this kid's beat up and killed and all of that. But here, as it goes along, there's a lot of smoke, you know, and at what point does that become fire? At what point do you just say, alright, this one was inconclusive, this one was not founded, this one was this, this one, you know, are they allowed to look at each one individually and break it down, or at some point were they supposed to figure out, you know, hey, these kids shouldn't have been there? It takes fire to constitute deliberative. Well, at what point does the smoke turn into fire here? Is it all smoke, is that what you're saying, and lots of it? There was quite a bit of smoke, particularly with regard to the Tomas girls, but there was none with regard to Monica. And all of the referrals until those in May and June of 2004 that were investigated were denied. Well, they are, but kids, anyone that, and I know that these workers from this standpoint, because I did this type of work as a prosecutor, you know, kids sometimes, if they're two years old, they can't tell you what happened. If they have parents that are telling them to say something else, they're probably going to say that. Or I, you know, with the Tomas girls, you know, but for the fact that he was doing bad things to them, they probably liked that they could smoke and drink and they could do whatever that they wanted, and, you know, but that still doesn't change what social services is supposed to do. You know, I mean, my kids would have probably liked to live with someone when they were teenagers that would let them smoke and drink, but, you know, unfortunately I, you know, imposed all these rules. So, you know, I guess it kind of comes back to do you agree that a foster child has a clearly established constitutional right to protection from a foster parent who is known or suspected to be an abuser? Not on the facts of this case. No, but do you agree to that? As a general proposition, if the state put a foster child into a situation where there was a known risk and knowingly exposed the child to that risk, yes, the majority of circuits have so held. That's a far cry, though, from the facts of this case. All right. Well, first, on the first problem we have to look at, is there a constitutional right? And, all right, so I'm asking you, is there a clearly established constitutional right to protection from a foster parent who is known or suspected to be an abuser? No. What part of that is no? Known, yes. Known, yes. Suspected, no. There are a number of circuit courts that have, I would suggest, callously used the term suspected. This court has made it very clear that mere suspicion does not constitute deliberate indifference. There has to be a known risk and conscious disregard of that risk, both in objectivity. Well, what are the, okay, what are the contours? I think that there, I probably think that there is a constitutional right there, but I'm not, it's not clear to me what the contours are. So what would you recommend for determining whether a foster parent's placement was unfortunate, wrong, or the result of deliberate indifference? What are the. . . It has to be deliberate indifference. The Supreme Court and this court, this court has compared a substantive due process analysis for pretrial detainees with the same analysis applied for prisoners under the Eighth Amendment under Farmer v. Brennan. The majority of the circuits that I've cited to in my brief have applied a deliberate indifference test with both the subjective and objective components. In this case, the reason why there was no clearly established right is because of Descheny. In Descheny, it really says there have to be two components. First, someone has to be placed into custody against their will. With regard to the Tomas girls, they were placed there on the motion of their lawyer. But can a child have a will? I mean, that's the whole purpose of having a guardian ad litem or someone to oversee the process, because children cannot reasonably make those decisions. So I'm not sure that transposing that requirement into the foster home context makes sense. A two-year-old can't decide whether he or she wants to be placed in a particular foster home environment. So your theory would totally fall down if there's an infant or a child who cannot make the decision or somebody who's mentally incompetent to make a decision. I agree. So I'm not sure that I agree with you that the placement has to be against the will of the person being placed, of the child being placed. That is the language specifically used in Descheny. Now, with regard to a very young child, I would agree with you. But these girls could have asked to leave at any time. They had a court-appointed lawyer who would have had them out of there if they had simply said so. The fact that they chose to stay, because, yes, maybe it was a place where they could smoke. Well, it complicates things, but I don't think that you can rely. I think you can rely on that they chose to stay as part of what the placement people were, you know. They have denials. They have kids saying that that's where they want to stay. So that's part of the body of whether they were deliberately indifference and when they were making their decision. But I don't think it lets them, but it doesn't let them completely off the hook to say, as whereas an adult says, yeah, I want to stay there. This is not, it is not the same with children. It's not. Otherwise, that would be a really easy job if you always ask kids, you know, if you just say, well, do you want to stay with Daddy? And then, you know, even though you have gonorrhea now and Daddy has gonorrhea and he's been molesting you for five years, but do you want to stay there? You know, that can't be the case. Well, with Daddy, of course, under Hoshaini, we wouldn't be dealing with any kind of a substantive due process claim. The Supreme Court has set parameters for that type of a claim, and one of those is that you have to, number one, be placed there against your will, and number two, you have to be unable to care for your basic human needs, including safety. And these girls, the Tomas girls, were repeatedly asked about these allegations and denied them all the way up until May of 2004. Counsel, it's not unknown that a person who's abusing a child will either psychologically or emotionally threaten them if they tell. So how do you deal with that situation? If you have an abuser who's telling the child, you better not tell, you better stay with me, and the child tells the parents that to the social worker, does that mean that there absolutely can be no liability just because the child is complying with the only father figure that she knows? That makes it really tough. There can't be civil rights liability for deliberate indifference because, again, there has to be a known substantial risk of harm. Or it can be so obvious that it should have been known. That's part of the rubric as well. You can't just turn a blind eye to something that's so obvious that a reasonable social worker should have known that there was abuse going on. It has to be obvious, and that's really where the district court, the first error that it made, is it applied a simple negligence test and said that a reasonable person would have suspected that he posed a threat. That's not even gross negligence. Gross negligence is where you have a known risk, and you don't exercise reasonable care to protect someone from that. If deliberate indifference is the standard, could you assume that there would be a case where the child denied that anything happened, but all of the other facts were such that it indicated something did happen, and they would be deliberately indifferent? Independent corroborative evidence, yes. I would call the court's attention to the recent decision in Stewart v. City of Everett where this court said that where you have a young child, like in the case of Monica, making an allegation that is unsupported by anything else, that doesn't constitute probable cause. And this is where the legal landscape here is completely uncharted. There are decisions, which I've cited in my brief, Gosvick v. Perez, which held that a psychological parent has a right not to have a child removed from them without, now I don't agree with that, but that's what the law says. Your position is basically, okay, whatever the rule is has to be such that just being wrong can't be the standard. That's clearly the law. Because they have to make the, and also, too, when they're faced with a natural parent and, or, you know, or when, well, Monica was adopted at some point. So that being the case, if you, then people can sue you. We know that people can sue you if you take their child away. Right. But there are cases that say that, you know, Gibson v. Merced County Department of Human Services said that might apply. There's some interest, amorphous interest for Gosvick parents. Is Monica different because she was adopted? Absolutely. After her adoption, her substantive due process claim terminated. I see I only have a couple of minutes left. I may reserve them for rebuttal. I have one question for you. Yes. Under what theory would these workers have been entitled to absolute immunity? You've appealed from the district court's determination that they were not absolutely immune. I understand your qualified immunity argument, but what theory gives them absolute immunity here? That theory is that they were, that applies only to the placement. But the placement decision was ordered by the court against the recommendation of the Department of Social and Health Services. They said, don't put these girls here. The court said, I'm ordering you to put those girls there. And to the extent they are executing a court order, they are entitled to absolute immunity. Thank you. Please proceed, counsel. Good morning, Your Honors. Good morning. Now I know who you are. I've watched you sit in court all week and decided that you're a newspaper reporter. I've been admiring the process. So now you get to participate. May it please the court, my name is David Moody. It's my pleasure to represent the plaintiff appellees. The appellants move for a summary judgment claiming immunity, both absolute and qualified. The district court, Judge Jones here in the Western District, did not grant immunity to any of the state actors who failed to protect these three children from a foster parent known or suspected to be an abuser. The standard of review, certainly, as Your Honors are aware, is de novo. But it is noteworthy that the district court was exceedingly deliberate. The record demonstrates that during the deliberation of this case, there was an on-bank decision from this panel in Beltran v. Santa Clara County, which basically eradicated the absolute immunity argument. The district court waited for more than 12 months to review what it considered a voluminous factual record and therefore issued a detailed 24-page memorandum decision denying. Mr. Moody, here's what I'm concerned about from your perspective. Yes. Obviously, I'm convinced at this point that it was wrong for those girls to be there. I mean, there's a lot of smoke and it probably turned into fire. But when you're asking for a rule that they have a right, it's clear to me that they have a right to have things investigated. But they don't always have a right, I don't believe, that when you have to ascertain credibility, that they're always going to be right. And, you know, while ultimately, say, at the end of 20-something complaints, we decide that they were wrong and should have known they were wrong. You know, but they did investigate everything, and there were problems that they confronted. And this isn't just going to go, it's not going to end here. Because then, you know, the wrong rule here, in my view, would say that, okay, if you investigate something and you're wrong, then you're going to be liable. If you have to decide who's telling the truth, you better be right. I understand, and that would be a tough case. This is not a tough case. The constellation of warnings in this case, Your Honor, is enlightening. There were 28 separate complaints of physical or sexual abuse in this case. There's one page from the excerpts of record that demonstrates this. One page that crystallizes this argument. If I could approach the bench and hand this to Your Honor. It's excerpts of record 1489. And on this document alone, it shows that 25 complaints. This is a document written by the defendants. 25 complaints were received in a span of over eight years. If you look at this, the 25 complaints were about the foster parent we're talking about here. They allege, as you can see in the penultimate column, it's called CA-N description. That stands for Child Abuse Neglect Description. Physical neglect, sexual abuse, physical neglect, physical neglect, sexual exploitation, the list goes on and on and on. These are not paper violations. These are serious business. And under findings, the department writes what it found during its investigation. And for five of these 25, there was an unfounded investigation. There's 20 or 21 of these investigations into serious neglect and sexual exploitation that were not investigated or closed without any finding whatsoever. The facts must be viewed in the light most favorable to the plaintiffs. And it doesn't take any squinting to view this document and see that not only were the investigations not performed, they weren't performed when allegations were rolling in on some of the most serious matters. Counsel, what does it mean when it says referred to licensing? Referred to licensing means that a complaint came in and whoever at the Department of Social and Health Services determined that that wasn't an allegation that they were going to investigate, they just considered that a quote-unquote licensing issue. The evidence in this case, specifically if your honors look at the declaration of Jane Raymond, which is at ER 1209 through 1236, is that many matters were simply passed on to licensing and never investigated at all. Inappropriately. Others weren't referred to licensing. They were fastballs right down the heart of the plate. Physical abuse, sexual exploitation, and they were not investigated. Counsel, what's your response to opposing counsel's observation that, at least as far as the Tomas girls were concerned, they wanted to stay there? The evidence is diametrically opposed on this. There is evidence in the record, you'll find it again at 1209 through 1236, that these girls on several occasions requested to leave and were denied that request. At one point, Ruth makes allegations that she's seen a video showing her child sister performing oral sex on the foster parent. She's taken out, and she's asked to submit to a lie detector test. She submits to that lie detector test. She passes the lie detector test. That result is given to the caseworker, and the next day, that caseworker authorizes Monica and Estera to stay in the home. Wasn't there a video, though, of the mother giving, of an adult giving? I don't know. There were so many pornographic images and videos found in this man when the Redmond Police Department finally broke down his door and rescued Monica, all showing that very horrific acts of sexual abuse were occurring in this home all along. The point is, these were investigated. These defendants had an obligation under state law to investigate, not just investigate, but to do it meaningfully and properly. This guy clearly, though, was a sociopath in the sense that he passed the devancy test with flying colors at some point. At various points, like a court gives these kids, you know, when social services is saying they shouldn't be with him, and then the police at some point, they don't believe the kids, and they won't authorize a search warrant or whatever because they don't think that there's probable cause. So, you know, it isn't as easy as, you know, he's clearly a sociopath, and he clearly appears to be, you know, even though, I mean, I'm not going to sit on the case or I can't say or I don't know what all the evidence would be, but he clearly appears to be a bad person at the end of the day. But would you agree that deliberate indifference is the standard? I mean, you have negligence claims, which are freestanding, and those still exist, but is deliberate indifference the standard on this? Absolutely it is, and we're here to talk about deliberate indifference. The appellants cite the case of Sacramento v. Lewis, which involved the high-speed chase involving an officer, and the Supreme Court appropriately determined that the officer's actions must be considered in the context of how rapidly the officer had to make decisions. However, the Supreme Court, the U.S. Supreme Court, was careful to articulate that the question of deliberate indifference is much different when the state actor has, quote, time to make unhurried judgments upon the chance of repeated reflection. For years and years, the defendants had plenty of time to make unhurried decisions about the fitness of this foster parent. Judge Callahan, he wasn't just a bad guy at the end of the day. He was a bad guy at the beginning of the day. How do you respond? Counsel says, look, the investigators came to that conclusion, and that's the recommendation they then made to the judge, and the judge disagreed. The judge said, I'm going to authorize placement. The judge did not say that he was going to command placement with anyone. The judge, the juvenile court judge, said, you may place the children, but the licensing process has to go forward. This argument has been tried before in the Seventh Circuit in the case of K.H. versus Morgan. The Seventh Circuit addressed a claim by four state defendants that they simply executed an order made by a judge in a juvenile proceeding. Judge Posner, writing for that panel, did not find that argument persuasive. Quote, there was a juvenile court proceeding, but the defendants have not pointed to any order commanding them to place the child with a particular foster parent. Well, how if, okay, if I were to agree with you, how do I write this opinion in terms of, because does this mean every time a social worker's wrong that then, you know, or does it mean if they're wrong two times, or is it because they're wrong 28 times, or what? The clearly established federal right in this case, and it's been established throughout the country, and if I could please offer up one more illustrative exhibit, which I have already shown to opposing counsel, and there's no objection. There is a clearly established right in the United States that a foster child enjoys a constitutional right under the 14th Amendment of the United States Constitution to be protected from a foster parent who is known or suspected to be abusive. Suspected? Yes. That's not our jurisprudence in the Ninth Circuit, is it? Judge Rawlinson, it is. Tell me the case that says suspicion is enough to trigger a deliberate indifference standard. If you'll take a moment to look at the map. I want to look at the Ninth Circuit. Let's go right to the Ninth Circuit and look at it. Take us there. The case of Tribble v. Gardner, Ninth Circuit, 1988, makes it clear that, quote, in the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits, and district courts. Before we go there, my question to you was, what is our standard for deliberate indifference in the Ninth Circuit? In this context. In the Ninth Circuit. Let's start with the general premise for deliberate indifference. Before we go, narrow it down. Yes. Okay. What's our definition of deliberate indifference in the Ninth Circuit? The definition here, all of these defendants are social work professionals. The Neely v. Feinstein case, which is a Ninth Circuit case from 1995, said that in the case where you have a special relationship involving a vulnerable person and a state actor, the deliberate indifference test is the Youngberg professional judgment standard, which is an objective test. Right. Neely says that because of the gravity of potential harm is so high in such a circumstance, the need for precautions is likewise high. So what's the standard? The standard is a professional judgment standard, which is objective. A person who is objectively viewing the evidence that's before the social worker, does the social worker know or suspect that the foster parent is abusive? Did you cite the Neely case in your brief? Yes, it's cited in the brief two or three times. Going back to Tribble v. Gardner that tells us here in the Ninth Circuit to look to the other circuits, we can see that starting in 1981 in the case of Doe v. New York City, the ball started rolling for the proposition that this federal right exists. The ball continues to roll in 1985 in the Tenth Circuit, in the Eleventh Circuit, en banc. The last circuit here on the map is the Third Circuit, an en banc decision that was joined by now Justice Alito. But the Tribble case doesn't tell us just to look to the law of the other circuits. It says look at the district courts within your own Ninth Circuit. The narrower question, though, is not whether this exists as a right. The narrower question is what triggers a finding of deliberate indifference. I think what we're struggling with is the idea that mere suspicion of this activity is enough to trigger deliberate indifference. Judge Callahan said, what if they make a mistake? I mean, is it a— It is no or suspect, and in this case, they knew. Each defendant in this case knew he was a criminal with a long criminal history. He had to come up for licensing four separate times. The court order said that he had to be licensed properly. If you are a criminal, you cannot be given a license. In your position, then, she asked you about how is she to write this. Your position, we don't have to reach the issue of whether they merely suspected. You take the position that the evidence is strong enough that they knew. I think viewing the light in the—viewing the evidence in the light most favorable to the plaintiffs, looking at the record, which is largely comprised of the defendant's very own documents and words, documents like I showed you in ER 1489 and throughout the record, these defendants knew. They knew several things. They knew that he was—had a history of drug offenses. They knew he had a criminal record. They knew that he posed a known risk to Monica, placing her in freezers and washing machines and placing her at age two on the side of the road where she could be hit by cars. This is in a video that the defendant saw. They know that he lied on each of his foster care applications. They knew that they received over two dozen specific warnings of physical or sexual abuse over an eight-year period from a variety of collateral sources. Can I ask you, does the adoption of Monica change the equation at all? It changes it only in that DeShaney recognizes two exceptions. The special relationship exception, which we're advancing here on behalf of Estera and Ruth and Monica up until the time she's adopted. Once she's adopted, it's classic danger creation and is— I don't know that it's classic there. I think that that's what—I mean, how is it classic danger exception if you look at DeShaney? If you look at DeShaney, which is followed in the Ninth Circuit with clarifications on the danger creation doctrine in both Huffman and Wood v. Ostrander, here the defendants, you need to look at what they knew before they allowed adoption to go forward. They knew that they chose not to investigate each allegation. They ignored the videotape about Monica. They engaged in a result-oriented— Well, your argument there is that it's everything that they did before she was adopted that creates the state exception. Yes. But DeShaney seems to be talking about what happens after that. DeShaney— I mean, you're taking a different tack on that. When she's adopted, the right does not fall because there's a special relationship anymore. It falls under the umbrella of danger creation. I think the Kennedy court from the Ninth Circuit said it best. If the state places a man in a position of danger from private persons but fails to protect him, it will not be heard to say that its role was merely passive. It is as much an active tortfeasor as if it had thrown him into a snake pit. And by allowing this adoption process to go forward, they threw Monica in a snake pit where she was used as a sexual pin cushion for this foster parent for years and years and years. Counsel, I'm looking at the Neely decision. Yes. Now, it discusses the term deliberate indifference. So would you point me to the language in this case that you rely upon to say that suspicion is adequate to trigger the deliberate indifference? Neely involved a person who was working at a state— I understand what it involves, but I'm asking you for the specific language in Neely that would support us using a finding of suspicion to meet deliberate indifference. I talked about Neely in the context of it applies the objective standard for deliberate indifference. I understand. Known or suspected— Or is the known or suspected language in Neely? It is not in Neely, Your Honor, and I didn't suggest that it is in Neely. They use the Youngberg objective standard. The circuit courts throughout the United States and the Mix case from the Ninth Circuit and the Garcia case from the Ninth Circuit that deal specifically with children in foster care use the phrase known or suspected to be an abuser. Well, I thought when I asked you the question, you pointed me to the Neely case as your case that would warrant triggering liability if there is a suspicion of child abuse. Because that would be a real departure from deliberate indifference jurisprudence. And I'm not convinced that the case authority in this circuit would allow us to do that. That's why I was asking you about that. Because I don't think there is a case in the Ninth Circuit that says mere suspicion of child abuse or neglect is sufficient to trigger liability. I just don't think it's there. And that's why I'm asking you, do you have a case that says that in that way? I would appreciate your citing us to the specific language, not your paraphrase, not your interpretation. But if there is language that says in a child abuse context, deliberate indifference means known or suspected wrongdoing. I haven't found it. You'll find it in the Nicks v. Sally Jones-Johnson case. Is that a Ninth Circuit case? District of Nevada. Those cases are not precedent for us. I'm asking you, I understand you're asking us to look at other cases to inform our decisions. But what I'm asking you for is Ninth Circuit precedent. So do you have a Ninth Circuit case that clearly says that deliberate indifference in the context of child abuse cases can be met where there is a suspicion of wrongdoing? That's my specific question. And my short answer to that is no. Okay. That's what we're trying to get. Because we need to know how far you're asking us to stretch Ninth Circuit law. And I'm offering that you don't need to stretch at all because in this case the defendants knew so many things and knew about so many allegations of abuse that they simply didn't even investigate. So if we accept your argument, we don't have to get to the suspects. You're saying they actually knew that there was? Yes. Objectively. You're using objective standards. Yes, they knew. If you look at these professionals from an objective standpoint, absolutely they knew. They knew each and every time he came up for relicensing. They knew each time they received a complaint. If you look at the declaration of a woman named Pam Deming, ER 126 through 130, she gave countless warnings. She's just another state-licensed foster parent to these social workers that harm was occurring in the house. And finally, the Mary Jane Smith declaration is powerful. ER 131 through 136, where she continued to warn and badger and send letters. And she also is a state-licensed foster parent. This isn't a matter of a neighbor having a vendetta against this man and calling in a lot of complaints. Complaints were received from a variety of sources in the neighborhood, from the school district, from other foster parents, from anonymous sources. These defendants knew that this man posed a danger. So what were the social workers supposed to make of the denials, you know, the vagaries back and forth? Yeah, he is. No, he isn't. What were they supposed to do with that? Defendants would have you believe that the victims in this case denied everything at every turn. That's not the case. There's two or three instances. And if you review the declaration of Ms. Raymond at ER 1209 through 1236, you'll find that these girls were asked about the abuse in the presence of the abuser. Is he abusing her? Are you? Is it okay to stay? Well, now, did they ever? Now, I know that Monica at one point said no, no, no. Bad touch. Yes, when she was two or something, very young. All right. Were there any other? Did any of the three young women ever, prior to when everything broke up, and did any of them ever say that he was inappropriately touching them? Yes, Ruth did. And where is that in the record? That's in the Jane Raymond declaration also, 1209 through 1236. Did she ever directly say it to the authorities, or did she say it to someone? Who did she say it to? She finally requested that she get out of the house. All right. Requesting that she got out of the house, did she say, recant the, did she? She went straight to a new foster mom and spilled it all to her, and that foster mom immediately told the defendants all of the things that she said. Once she was removed from the umbrella of this abuse, she opened up right away to her new foster mom, and that foster mom did everything she could to warn the authorities and these defendants that bad things were happening in that house, and yet they allowed Estera and Monica to stay for a long period after that. Counsel, as a practical matter, why do you think that would happen? Why would the social workers just ignore all of these warnings? I think that they put their necks out for this man to be licensed in the first place. If you read the declaration of a woman named Pam Deming at ER 126 through 130, she said that she made so many complaints that one of the defendants, Kniezer, said, Stop making these complaints. You're going to jeopardize me placing Monica with this man. I think that for whatever reason, he is a sociopath. I think he charmed a couple licensors early on. Well, and there's the crazy ex-wife or mother, too, that is in jail all the time, and she makes complaints, too. Yeah, I think that the defendants early on branded these girls as liars, and from that point forward, they just stopped investigating, and the abuse continued and continued and continued. In conclusion, and I know I've gone well past my time. Way past my time. We helped you, though. You have. Thank you. The plaintiffs enjoyed a clearly established federal right to protection from this foster parent. The right was clearly established before the events giving rise to this lawsuit. Reading the KH case from the 7th Circuit, the case from the 11th on Bonk, the case from the 10th Circuit on Bonk, those are strong rebukes of qualified immunity in situations like this. Viewing all the facts, and the record is large, in the light most favorable to the parties, we ask that you do what the district court did and deny defendants' requests for qualified and absolute immunity. Thank you. All right. Thank you, counsel. Rebuttal. Thank you, Your Honor. You do need to address the issue of whether a mere suspicion alone can constitute deliberate indifference, and the law in this circuit is quite clear on that point. The reason you need to address that issue is because that's the standard the district court applied. It's the wrong standard. It's a simple negligence standard, and, therefore, you can either look at it yourselves or remand it back to the district court. I would call to the court's attention Berg v. Kinchlow, which is a case that specifically says that actual knowledge of impending harm, not mere suspicion, is required. But opposing counsel says you got that in this case, and he cited a number of examples, two of which caught my attention when I read the briefs and the record. They knew on two occasions that this fellow had lied about his criminal record in submitting the applications for the license. They knew it wasn't true. Now, to me, that would be a big red flag. Here he's asking for a license, and he's lying about his criminal record? I would think to myself, what else is not true if this isn't true? Well, it's sort of the elephant in the living room, Your Honor. I mean, everybody knew this guy had a criminal history. He knew it. The judge knew it. The licensors knew it. The licensors were processing an exception to his criminal history to give him a license. The judge had given him a certificate of rehabilitation to facilitate his licensure. So the fact that he checked the forms wrong really is not... Well, deliberately did so. You're not contending that this was a mistake. I mean, he's trying to cover up this criminal record for whatever reasons, and that would make me very suspicious. I don't know what his state of mind was, Your Honor, but in terms of whether it had any impact on what the court or the Department of Social and Health Services did in this case, it had none, because everybody knew exactly what his criminal history was. The court knew what his criminal history was when it ordered that Monica be placed with him, and the court knew what his criminal history was when it ordered that the DeMoss girls be placed with him. And please read my reply brief. I set out in there the specific language where the court specifically directed the defendants, the state employees, to place these girls there. We're not making that up. But subject to. I mean, it was conditional. Yeah, but they had to put them there initially, and then after that there were licensure issues that needed to be addressed. And if they discovered that there were reasons why they shouldn't be placed there, they could have gone back to the court and made that known. I was on the welfare board in the state of Nevada for many years. Well, Your Honor, the point here is all of this information on all of these referrals was given to the court. And, you know, Judge Kalan, you asked the question, you know, about Monica and asking to leave. Well, in fact, you know, when Monica came, or I'm sorry, not Monica, when Ruth came forward, that was after May of 2004. That's when, as you put it, everything broke loose. But up until that point in time, every allegation of abuse and neglect was denied. Let me ask you this in terms of because, obviously, is there a clearly established right? And it seems to me that there's some right. But was it clearly established during this period of time? What's your position on that? Or was it just that it was clearly a – I mean, they know something. They're not supposed to put people – they're not supposed to put children in danger. But in terms of the contours of that right, was that clearly established? Or what's your position on that? There is no case remotely analogous. But does it have to be? It does. Under Anderson v. Creighton, the facts and in order for the defendants to be denied qualified immunity, the law has to be clearly established. And in order for it to be clearly established, it has to be established through closely analogous case law. The principle has to be established. So if there is a case that says foster children have a constitutional right not to be placed in a home where a known abuser or so clear that it's obvious, then liability can ensue. That's good enough. It doesn't have to be you have three children and one makes this allegation, one makes that allegation, it's denied. It doesn't have to be that. I agree with you, Your Honor. But the thing that makes this case different, there's two things, especially for the Tomas girls. Number one, they asked to be placed there. They had the court order that they be placed there. Most of the cases, if you look at them, are dealing with deliberately indifferent placement. Very few of them deal with a deliberately indifferent failure to remove. Okay, if we give you that. What about after they were placed there and then the allegations that were made after they were placed there? The allegations, and I did an appendix to my brief, which is a timeline of referrals, and I went through and very carefully cited to the record on each one of those. And if you check, you will see that these girls were denying abuse had occurred. The source of these allegations were highly suspect. They were, you know. The mother? Is it possible that there could be different results as to different individuals, depending on where they are in the spectrum? Oh, absolutely. Or different results as to Monica, as to the Tomas sisters? There's no question that there was no deliberate indifference with regard to Monica. Monica, there was only one referral of abuse about Fabergas with regard to Monica, and that was made in July of 1997. That was investigated, not by the defendants. Monica, who was three, made a statement, no, no, no. Stop, Papa, pointed to her bottom. That was referred. Defendant Kniezer, in this case, made the referral on that case. It was investigated. She didn't repeat the allegation. Mr. Fabergas denied the allegation. And her own mother said, number one, he wouldn't abuse her, and number two, he hadn't been alone with her. And the record indicates that for about the prior year, he had only had supervised visitation with her. The court was aware of that investigation and that result at the time that it ordered her placement. From the date of that referral through the date of the court-ordered placement through her adoption- Well, is a social worker that dealt with this situation earlier in the process in a better position than the social worker that would have imputed knowledge of everything that's gone on? Is the 28th complaint a worse place to be than the first complaint? I would agree with that, Your Honor. But even at the 28th complaint, a number of these complaints came in. After this May 2004 timeframe. These are after Ruth has requested to be removed, and she is immediately removed. During that period of time, her sister is adamantly saying that these are horrific lies and accusing her sister of being involved in this. And as you pointed out, I believe, Detective Canese, who's been involved with investigating these allegations over the years, he doesn't believe them. He has a warrant. How many did he investigate? At least two. The problem is, weren't they required to report each allegation to the police? Maybe it would have been different if there had been 28 investigations to do as opposed to two that were reported. No, they weren't required to report every single one of them. There's a distinction- Let's finish this. Which ones were required to be reported, and why? Any allegation of abuse or neglect was required to be reported to law enforcement. Okay, and how many allegations of abuse and neglect were there in the record? I believe there were 13. And how many of those 13 were reported to the police? I don't know the exact answer to that, Your Honor. Not 13? Not- Not 10? But of the ones that weren't reported to law enforcement, they were investigated and denied. But don't you agree that the police might have had a different impression if all of them had been reported instead of just a select few had been reported? Well, I don't know what the police might have thought. But again, May 2004 is the critical timeframe here. That's when the allegations of the videotape and the sex and the drugs is made by Ruth. That is investigated contemporaneously by law enforcement with the Department of Social and Health Services. In the course of that investigation, Detective Canese gets a warrant. He goes and talks to Mr. Fabergas. At that point in time, he doesn't believe he has probable cause to execute the warrant. So he doesn't. And Mitchell v. Forsythe says you shouldn't look at these cases in hindsight. And if you look at what was going on at that point in time, I would refer the court to the guardian ad litem, who is the court's perspective here. The court, through the guardian ad litem, thought even after Estera came forward and said, yes, I was sexually abused and given drugs, she did not believe either one of the girls. That's a sad commentary on that system. And thought that the mother was behind all of it, Your Honor. Let me ask you a question. You said that the district court used the wrong standard in determining whether or not there's qualified immunity. Would you look at the district court decision and tell me where in the district court decision it went wrong in terms of its analysis? Point me to the page of the district court decision where you say the wrong standard was used. I can point you to my reply brief where I set that out in detail. I don't want your reply brief. I want where in the opinion where the district court went wrong. This would be excerpt of the record, pages 17 through 20. And what page of the order is that? Of the order? This would start on page 17 of the order. And it goes through, and for Kniezer, a reasonable person in Kniezer's position would have suspected that Fabergas posed a threat to Monica's safety. And then for Kleinan, this is on page 18. A reasonable person in Kleinan's position would have suspected that Fabergas posed a threat to Monica's safety. Further on down for the licensors, who are Drake, Walker, and Loeffler, the number and seriousness of complaints against Fabergas would have alerted a reasonable person in the position of these defendants that Fabergas posed a threat to plaintiff's safety. Do you want me to keep going? Every one of them says that. They're not the same language. And I lay that out on page 28 of my reply brief. Can I ask you to clarify something? I may have misunderstood you. You were just talking about directing us, asking us to look carefully at what happened in May of 04. You said that the officer had a warrant, if I followed you, but he didn't feel he had probable cause to execute the warrant? That was in August, yes, after Estera came forward and also alleged that. But he had a warrant, what, commanding him to search and to look for evidence of this abuse, but made, what, a decision after the warrant was issued that he wouldn't follow the command of the warrant and do that? That's my understanding, yes, Your Honor. The warrant is based on probable cause, though. Yes, but he, what he said was that he didn't think he had probable cause to execute the warrant after he talked to Mr. Fabregas. So had he done the affidavit in the original search warrant? I don't know. I believe he did, but I'm not sure. I have one last question. What are we to make of this document that was handed up? It has a number of the incidents were investigated, found to be unfounded, but then there's blanks, and those blanks are indicated with a yellow. Does that mean, are we to infer that there was no investigation of those complaints? Please, again, look at the timeline of referrals that I did and that's attached to the reply brief. I go through the referrals. Some of these, there are different referrals, the way the process works. Referrals of abuse or neglect can result at that point in time with a valid, I'm sorry, a founded, unfounded, or inconclusive finding. Allegations that are licensing violations result in a finding of valid or invalid. Those are, those are those. He's all accepted. Yeah, these are all abuse or exploitation or neglect, at least the ones that, some of them you're right, some of them there's blanks, but there's a number here that denominate abuse, suspected abuse, suspected neglect, or sexual exploitation, and there's no corresponding finding. Does that mean they were not investigated? No, that's not what it means. And I think, again, unless you want me to go through each one of them, I think what you really need to do is compare these referral numbers with the table that I did, which shows what the allegation was, where that is in the record. This is in your reply brief? This is in appendix to my reply brief, yes. And one thing that Judge Jones noted but seemed to dismiss is that during part of this period of time, when there were allegations that went to licensors, when Mr. Fabergas didn't have a license, they didn't have any authority to investigate those. He still counted against them the fact that they didn't investigate those, but I would suggest that you can't really castigate the licensors for not investigating something they didn't have the authority to investigate. Well, when you say they, you're not referring to the police officer. He had independent authority to investigate those complaints, completely independent of the licensing decision, right? I mean, a complaint of child neglect or abuse of exploitation, that doesn't have to be wrapped in a licensing decision for the detective to get involved. Well, I mean, for example, Your Honor, you gave the example of a picture. There was an allegation that there was a picture of Monica involved in a sexual act with Fabergas. It's a horrific allegation, and it's investigated, and it turns out it's a picture of her mother. Or he gave her a picture of the mother. There are pictures of numerous people there, and he picked out one with the mother and gave it to the cop and said, here's what she was talking about, and hid the picture with him and Monica somewhere else. Actually, the picture came from the nanny, and so that's not what happened. In any event, you've exceeded your time. Thank you. It's very complicated. Thank you both for your informative arguments. This case is submitted on the briefs, and we are on recess until 9 o'clock a.m. tomorrow morning.
judges: Burns, Rawlinson, Callahan